127 Mich. App. 646 (1983)
339 N.W.2d 515
MICHIGAN NATIONAL BANK
v.
DEPARTMENT OF TREASURY
Docket No. 64087.
Michigan Court of Appeals.
Decided August 1, 1983.
Roger D. Trana, for petitioner.
Frank J. Kelley, Attorney General, Louis J. Caruso, Solicitor General, and Richard R. Roesch and Thomas J. Kenny, Assistants Attorney General, for respondent.
Before: R.B. BURNS, P.J., and BRONSON and R.E. ROBINSON,[*] JJ.
R.E. ROBINSON, J.
Respondent-appellee, Michigan Department of Treasury, undertook an audit of dealings in gold and silver conducted by petitioner-appellant, Michigan National Bank, through its international division, during the period from January 1, 1977, through July 31, 1980, and assessed a sales tax deficiency against petitioner on its dealings. The tax, with interest and penalties, amounts to $46,701.55. Ninety-five percent of petitioner's dealings involved coins, primarily South African gold Kruggerands.
Typically, when a customer of the bank sought the bank's help in arranging for the purchase of gold, the bank, as a service to its customers, would, by telephone, contact an out-of-state dealer to determine the current rate of the items sought. If the rate was acceptable to the customer, he would so indicate, would advise the bank of the quantity to purchase, and would deposit part of the purchase price with the bank. The bank would then place the order with the dealer and pay the dealer with bank funds. After receipt of the items ordered (generally Krugerrands), the bank would call the customer who would pick up the coins from the bank and pay the balance due. For its services, the bank was paid a commission by its *650 customer based on the amount paid by the bank for the coins.
The Krugerrand is a coin minted by the government of South Africa, containing one ounce of fine gold, and issued as part of the currency of South Africa.
The treatment of these transactions by the Treasury Department as subject to Michigan's sales tax presents an issue of first impression in this state and raises two issues which merit discussion.
I
IS THE SALE OF SOUTH AFRICAN KRUGERRANDS BY PETITIONER A TRANSFER OF THE OWNERSHIP OF TANGIBLE PERSONAL PROPERTY WITHIN THE MEANING OF MICHIGAN'S GENERAL SALES TAX ACT?
The General Sales Tax Act, 1933 PA 167, so far as it is applicable to this case, is imposed upon "* * * a transaction by which is transferred for consideration the ownership of tangible personal property * * *". MCL 205.51(1)(b); MSA 7.521(1)(b). The act does not define "tangible personal property". However some indirect light is shed on the question by reference to the intangibles tax act, 1939 PA 301, which defines intangible personal property as: "moneys on hand or on deposit or in transit * * *". MCL 205.131(1)(b); MSA 7.556(1)(b).
Michigan's Uniform Commercial Code, 1962 PA 174, defines "money" as follows:
"`Money' means a medium of exchange authorized or adopted by a domestic or foreign government as a part of its currency." MCL 440.1201(24); MSA 19.1201(24).
The South African Mint and Coinage Act, No. 78 of 1964, provides:
*651 "Sec. 12. Legal Tender  A tender of payment of money, if made in coins which are Republican coins or Transvaal coins of current mass, shall be legal tender 
"(a) in the case of gold coins, for the payment of any amount; * * *".
Both parties to this litigation agree that the Kruggerand is a part of South Africa's currency.
As a general proposition, it would seem from the foregoing that anything which is part of the currency of this country or of any foreign country should not be subject to Michigan sales tax upon transfer of its ownership.
But the Krugerrand is a special breed. Unlike most currency coins, these coins do not possess an unfluctuating denominated value set by the issuer. Rather, they possess an intrinsic value in the form of one ounce of fine gold, the value of which fluctuates with the changes in the world-wide market in precious metals.
It is clear from the record in this case that petitioner's customers acquired Krugerrands as investments in gold; in other words, for their intrinsic value as dictated by the precious metals market.
But is the question resolved by saying that we look to the physical character of the item transferred  its precious metal content? What about the numismatist who values coins perhaps not for their content but for their scarcity (few of a kind), or for their appearance (a minting defect) which makes them peculiar. These transactions have been taxed as commodity transactions. Losana Corp v Porterfield, 14 Ohio St 2d 42; 236 NE2d 535 (1968).
On the other hand, few would seriously urge that a sales tax should be assessed on the conversion *652 of United States currency into Krugerrands by a visitor from this country to the Republic of South Africa when the intended use of the coins is as a medium of exchange while in South Africa.
These exercises lead inevitably to the conclusion reached by the United States Supreme Court in Comm'r v Court Holding Co, 324 US 331, 334; 65 S Ct 707; 89 L Ed 981 (1945), that,
"The incidence of taxation depends upon the substance of a transaction."
Applying this standard to the transfer of coins, it appears that transactions involving the same type of coins can in one instance be free from tax and in another instance be subject to tax. The Losana Court, supra, agreed that money is intangible personal property and not subject to tax so long as the statutory definition of money (defined in the Ohio Code as "* * * circulating or intended to circulate as currency". § 5701.04 Ohio Revised Code) is strictly respected.
So, too, where Krugerrands are transferred as a medium of exchange (Michigan Uniform Commercial Code, supra), the coins remain intangible personal property, not subject to tax. But where, as here, they are transferred as an investment commodity, they become tangible personal property within the meaning of the General Sales Tax Act.
Applying this reasoning to a similar factual situation in Smith v Dep't of Revenue, 376 So 2d 421 (Fla App, 1979), cited by appellant, we would reach a different conclusion from that reached by the Florida court. We believe that the better reasoning is found in Losana, supra, which treats money as such only when it is transferred as a medium of exchange.

*653 II

WAS PETITIONER ENGAGED IN MAKING SALES AT RETAIL WITHIN THE MEANING OF THE GENERAL SALES TAX ACT?
Petitioner argues that, since it maintains no inventory of coins and since it was not an agent for the out-of-state coin dealers but was merely a conduit through which the customers' orders were transmitted to the dealers, it was not engaged in sales as a retailer and is not liable to collect or pay the tax.
The General Sales Tax Act, 1933 PA 1967, establishes the basis for the tax as follows:
"There is hereby levied upon and there shall be collected from all persons engaged in the business of making sales at retail, as hereinbefore defined, an annual tax for the privilege of engaging in such business equal to 4% of the gross proceeds thereof, plus the penalty and interest when applicable * * *." MCL 205.52; MSA 7.522.
and further defines the term "sale at retail" as:
"* * * a transaction by which is transferred for consideration the ownership of tangible personal property, when the transfer is made in the ordinary course of the transferor's business and is made to the transferee for consumption or use, or for any other purpose than for resale." MCL 205.51(1)(b); MSA 7.521(1)(b).
The typical transaction which effectuated a Krugerrand purchase followed this scenario:
1. Customer approaches petitioner bank to inquire about purchase of coins.
2. Bank contacts out-of-state dealer to determine the then market price and relays this information to customer.
*654 3. If satisfied with the price, customer places order for coins with bank and leaves a deposit with the bank to cover the price or a portion thereof.
4. The bank places coin order with out-of-state dealer and pays for it with bank funds.
5. When the bank receives the coins from the dealer, it delivers them to the customer at the bank, and the customer pays the balance due.
6. For its role in the transaction, the bank charges the customer a commission based on the purchase price of the coins.
At the time of the transactions involved in this case, the General Sales Tax Act also contained this provision:
"(2) When it shall be determined by the department that it is necessary for the efficient administration of this act to regard an unlicensed person, including salesmen, representatives, peddlers or canvassers as the agents of the dealers, distributors, supervisors or employers under whom they operate or from whom they obtain the tangible personal property sold by them, irrespective of whether they are making sales on their own behalf or on behalf of the dealers, distributors, supervisors or employers, the department may so regard them and may regard the dealers, distributors, supervisors or employers as making sales at retail at the retail price for the purposes of this act." MCL 205.51(2); MSA 7.521(2), as amended by 1976 PA 70.
The Tax Tribunal reads this provision as imposing liability on the bank for the tax as agent for the coin dealer. We do not so read it. In our view, it is nothing more than a restatement of the law that the principal (dealer) can be held liable, tax-wise, for the acts of its agent. It does not impose liability upon the agent for acts of his principal and is not relevant to this case.
*655 This is not to say, however, that the bank is not liable for the tax.
The bank seeks to relieve itself of liability for the tax on the ground that it was only a conduit between the consumer and the coin dealer. In support of its position it emphasizes that it maintained no inventory of coins. Yet, on this record, there is no evidence of an agreement between the consumer and the out-of-state dealer; there is no evidence that the consumer knew of the existence or identity of the out-of-state dealer or that the dealer knew of the existence or identity of the consumer; the dealer charged the bank for the coins and delivered them to the bank and the bank in turn charged the consumer and was paid by the consumer, whereupon it delivered the coins to the consumer.
In similar factual situations, except that the transfer of merchandise was direct from the manufacturer or supplier to the consumer at the behest of the middleman, other courts have found a sale and resale with the middleman in the position of retailer to the consumer. Graybar Electric Co v Curry, 238 Ala 116; 189 So 186 (1939), aff'd 308 US 513; 60 S Ct 139; 84 L Ed 437 (1939); Meyer v State Bd of Equalization, 42 Cal 2d 376; 267 P2d 257 (1954); Bank of America Nat'l Trust & Sav Ass'n v State Bd of Equalization, 209 Cal App 2d 780; 26 Cal Rptr 348 (1962) (question addressed under California's use tax act). In each of these cases, the manufacturer knew the identity of the consumer and shipped directly to the consumer without the middleman handling it. Michigan also found a retail sale in Michigan under similar facts although the case was decided on different grounds. Beitzel v Dep't of Revenue, 2 Mich App 311; 139 NW2d 780 (1966).
*656 On the above facts, it is our opinion that there was a sale of coins by the out-of-state coin dealer to the bank and a resale at retail by the bank to the consumer for consideration. The latter transfer of ownership being a taxable event upon which the bank is obligated to pay a sales tax.
Inasmuch as our opinion finds a sale of tangible personal property within the State of Michigan, it is not deemed necessary to discuss, as did the Tax Tribunal, the possible impact of Michigan's Use Tax Act or of the federal interstate commerce clause.
Affirmed. No costs, a public question being involved.
R.B. BURNS, P.J., concurred.
BRONSON, J. (dissenting).
I respectfully dissent. I am willing to assume arguendo that the items in question, South African Krugerrands, constitute "tangible personal property" subject to sales taxation under MCL 205.51 et seq.; MSA 7.521 et seq., 1979 AC, R 205.5.[1] Nonetheless, I believe that the *657 imposition of sales tax upon plaintiff was inappropriate because plaintiff was not "engaged in the business of making sales at retail", MCL 205.52; MSA 7.522.
Several Supreme Court cases indicate that where a company merely accepts orders from Michigan customers and fills those orders through an out-of-state source, at the customers' request, the company is not "making sales at retail" for sales tax purposes. See Montgomery Ward & Co, Inc v Fry, 277 Mich 260; 269 NW 166 (1936). See, also, J B Simpson, Inc v O'Hara, 277 Mich 55; 268 NW 809 (1936). In each case, the plaintiff was ostensibly a retail store located in Michigan which took orders from Michigan customers after providing those customers with a catalogue or series of samples. The orders were then forwarded to an out-of-state wholesaler or manufacturer, where they were filled. The out-of-state source then sent the ordered goods to the plaintiff, or in the case of Montgomery Ward, supra, directly to the customer. In each case, the Supreme Court held that imposition of a sales tax on such a transaction violated the federal interstate commerce clause, Montgomery Ward, supra, pp 268-269; Simpson, supra, p 59. Implicit in each holding was the observation that the plaintiff, by limiting its role to the mere taking of orders to be filled out of state, was not acting as a Michigan retailer, or in the language of the statute, was not "making sales at retail" to its Michigan customers.
In the present case, the petitioner bank had a similarly limited role. It merely accepted orders from its Michigan customers for the delivery of certain coins and, at the customers' request, forwarded *658 those orders to an out-of-state dealer. Although the coins were shipped to petitioner rather than directly to the customers, cf. Montgomery Ward, supra, petitioner here did not resell the coins in Michigan, but instead merely notified its customers that delivery had been completed.
"Sale at retail" is defined in the General Sales Tax Act as "a transaction by which is transferred for consideration the ownership of tangible personal property". (Emphasis added.) MCL 205.51(1)(b); MSA 7.521(1)(b). Thus, in order to consummate a "sale at retail", the owner must transfer its ownership. Under the facts presented, petitioner was never the owner of any of the coins ordered by Michigan customers. Instead, the owner was the out-of-state dealer who undertook to fill each order. "Ownership" connotes the right to use and enjoy property, to exercise dominion over it, and to transmit the property for whatever amount of consideration the owner may desire. In the present case, once petitioner had received an order to be filled by an out-of-state dealer, it was required to hold the order until the customer came to take delivery. Petitioner had no right to charge the customer any price other than that which the dealer had quoted telephonically and, more important, had no right to transmit the coin to anyone other than the customer who ordered it. In cases where a customer failed to take delivery, petitioner was required to return the coins to the out-of-state dealer; petitioner did not have the option of reselling the coins to a third party. Most important, petitioner could never exercise dominion over the coins nor could it use or enjoy them as would a true "owner" of property. In short, petitioner enjoyed none of the benefits of "ownership" with respect to these coins. Under these circumstances, *659 I find it highly inequitable to characterize petitioner as an "owner" capable of effecting a "sale at retail" for taxation purposes.
Beitzel v Dep't of Revenue, 2 Mich App 311; 139 NW2d 780 (1966), relied on by the Tax Tribunal and cited by the majority, does not compel a contrary conclusion. The majority concedes that it was decided on completely different grounds. There was no discussion of whether a company's function of merely taking orders for customers, to be filled by out-of-state suppliers, constitutes a "sale at retail". In that case, the taxpayer who took the orders did more than just provide an order-taking service; instead, it actually made a profit by billing local customers at a mark-up from its cost to the out-of-state suppliers. Contrast the present case, where petitioner takes no mark-up whatsoever and where the compensation for its services is at most a nominal fee to cover costs and a measure of goodwill from its customers.
Another crucial factor distinguishing Beitzel from the present case is that, in Beitzel, the company taking orders was in the business of selling materials similar to those which its local customers ordered, namely, novelty advertising items. In this regard, I find it significant that the General Sales Tax Act defines retail sales not only as those in which ownership is transferred but also those in which the transfer is made "in the ordinary course of the transferor's business". MCL 205.51(1)(b); MSA 7.521(1)(b). There has been no showing whatsoever that the "ordinary course" of petitioner's business as a bank includes the function of taking orders for its customers to buy gold through out-of-state suppliers. This function instead appears to be something of a courtesy which is at best incidental to petitioner's business as a bank. I would find *660 that petitioner is not "making sales at retail" for purposes of the Michigan General Sales Tax Act. The question remains, however, whether petitioner could properly be responsible for paying a use tax on the coins delivered through the program in question.
The Tax Tribunal found that even if petitioner were not liable to pay any sales tax it was required to pay a use tax based upon its role as "agent" for out-of-state dealers. I believe that this finding was inappropriate for two reasons. First, the respondent never even assessed a use tax against petitioner, and neither party raised the issue at any stage of the proceedings below. Accordingly, it was improper to base its decision even in part upon a use tax theory without affording the parties an opportunity to fully address the issue. At best, the tribunal's findings with respect to the use tax were premature.
However, there is a second, more important reason why it was inappropriate to find petitioner liable for payment of a use tax. Even if the transactions in question are subject to a use tax, the direct incidence of that tax must fall upon one of the actual parties to the transaction; namely, either the out-of-state seller or the Michigan customer who orders and purchases the coins.
The Use Tax Act was enacted to supplement the General Sales Tax Act by imposing a tax on tangible personal property purchased out of state for use, storage or consumption in this state. See Nat'l Bank of Detroit v Dep't of Revenue, 334 Mich 132, 141; 54 NW2d 278 (1952). The purpose of the use tax was to counteract the tendency of customers to go out of state to purchase tangible personal property which would be used or stored in Michigan. Imposition of the use tax had the *661 effect of removing a competitive advantage enjoyed by non-Michigan merchants as a result of this practice.
Under the Use Tax Act, any person engaged in the business of selling tangible personal property for storage or use in this state is required to register with defendant, MCL 205.95(a); MSA 7.555(5)(a). Under administrative rules promulgated by respondent, only those out-of-state sellers who actively solicit sales of tangible personal property in Michigan are required to register. 1979 AC, R 205.26(a). If the seller is not actively soliciting sales of such property in Michigan, the tax must be borne by the end user or consumer, MCL 205.96(1); MSA 7.555(6)(1); MCL 205.97; MSA 7.555(7). The customer buying goods from a non-registered out-of-state seller must file a use tax return with respondent, 1979 AC, R 205.26(b). Similarly, where sales are made out of state, the seller is not required to register, and respondent's sole remedy is against the consumer. J B Simpson, Inc v State Bd of Tax Administration, 297 Mich 403, 406; 298 NW 81 (1941).
Although little evidence was presented as to this issue, it is apparent from the record that the out-of-state dealers in question here do not actively solicit business in this state. It follows that these dealers were not required to register with respondent for payment of use taxes. Accordingly, unless it can be established that petitioner acted as an "agent" on behalf of these dealers in negotiating the transactions or otherwise securing the latter's business in Michigan, it appears that respondent's sole remedy is against the customers who order, and take delivery of, the coins. J B Simpson, Inc v State Bd of Tax Administration, supra; MCL 205.96(1); MSA 7.555(6)(1).
*662 I question the tribunal's characterization of petitioner as the out-of-state dealers' "agent". In this context the term "agent" connotes a party with a measure of discretionary authority to act on behalf of the principal in negotiating a transaction or otherwise securing the principal's business. Cf. Lincoln v Fairfield-Nobel Co, 76 Mich App 514, 518; 257 NW2d 148 (1977); Saums v Parfet, 270 Mich 165; 258 NW 235 (1935). No evidence was presented, and certainly none was cited, in support of the tribunal's characterization of petitioner as an "agent". For example, respondent did not establish that any out-of-state dealer had expressly or impliedly conferred upon petitioner ajy authority to negotiate a price on behalf of the dealer or, for that matter, any authority to negotiate on behalf of any customer who placed an order. Nor did petitioner ever hold itself out as an "agent" acting on behalf of either party. Instead, petitioner properly characterizes its role as that of a "conduit" whose sole purpose was to bring the out-of-state seller and Michigan purchaser together.
I would hold that the imposition of sales tax was improper for lack of evidence that petitioner was acting as a retailer and would further hold that there was insufficient evidence upon which respondent could have based any imposition of use tax. Respondent's sole remedy for collection of use taxes is against the Michigan customers who took delivery of the coins. Accordingly, I would reverse the assessment of taxes against petitioner.
NOTES
[*] Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.
[1] I take this position despite the fact that the provisions distinguishing "tangible" from "intangible" property create an ambiguity which, according to established rules of statutory construction, must be resolved in favor of the taxpayer. Detroit v Norman Allan & Co, 107 Mich App 186, 191; 309 NW2d 198 (1981); In re Dodge Bros, 241 Mich 665, 669; 217 NW 777 (1928). The ambiguity is created by the fact that "tangible" property, left undefined by the General Sales Tax Act, supra, is defined by administrative rule as including "all * * * commodities * * * and substances capable of being exchanged", yet "intangible property" is expressly defined by the intangibles tax act, MCL 205.131 et seq.; MSA 7.556(1) et seq. as "monies on hand or on deposit", arguably including foreign currency. Since the legislative definition of intangibles could conceivably be broad enough to include foreign currencies, even where the currency is minted in the form of a precious metal such as gold, there is room to argue that under the present legislative scheme and applying established rules of statutory construction, the Krugerrands should be characterized in a manner most favorable to petitioner, namely, as foreign money not subject to sales taxation. See Smith v Dep't of Revenue, supra. I find it unnecessary to address this issue, given my resolution of petitioner's alternative claim on appeal that it was not acting as a retailer in distributing the coins.