NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 17a0367n.06

CASE NOs. 16-1321 & 16-1380

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ROSE COULTER-OWENS, individually and on behalf of others similarly situated, | ) ) ) | **FILED** Jun 26, 2017 DEBORAH S. HUNT, Clerk |
| *Plaintiff-Appellant/Cross-Appellee*, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| TIME INC., | ) ) ) | COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| *Defendant-Appellee/Cross-Appellant*. | ) ) | |

**Before: SUHRHEINRICH, BATCHELDER, and STRANCH, Circuit Judges.**

**ALICE M. BATCHELDER, Circuit Judge.** In this diversity action alleging that disclosure of certain private information was in violation of state law, the plaintiff class representative appeals the summary judgment for the defendant and the defendant challenges the plaintiff's standing to sue. We find that the plaintiff does have standing and AFFIRM.

**I.**

Time Inc. ("Time") publishes and sells magazines. One way that it sells magazines is through third-party subscription agents: a customer places an order and pays the subscription agent; the subscription agent forwards the order information to Time and pays Time some discounted or lower amount (i.e., the agent retains some profit); and Time fulfills the order by mailing the magazine directly to the customer for the duration of the subscription period. The agent never takes physical possession of the magazines. The contracts between Time and the subscription agents are titled "Resale Agreements." The price the subscription agent pays to

Time and the profit it makes on the sale are unique to—often different for—each agreement. The subscription agent collects payment from the customer and remits taxes on the sale, if applicable; the agent does not provide Time with credit card or other payment information. And the subscription agent (not Time) addresses and resolves customer-billing or delivery complaints.

Obviously, Time uses the "order information" (customer's name, address, and magazine choice) to fulfill the orders, but Time also sends that information to two other companies: Acxiom Corporation and Wiland Direct. Time does so to facilitate its "list rental business": Time sells ("rents") its subscriber lists to other enterprises (e.g., companies, political groups, charities) who want to target their own marketing to readers of specific magazines. As alleged here, Acxiom is a "vast marketing or data mining database" that enhances Time's subscriber lists with personal or demographic information obtained elsewhere, which enables Time to narrow its lists into focused, and therefore more valuable, subsets. And Wiland is a "marketing intelligence company" that shares its massive consumer database, which is valuable to Time's own marketing endeavors. Time does not seek or obtain customer consent before sharing this order information, but does provide notice of this practice in its magazines and allows the subscribers to "opt out."

Rose Coulter-Owens represents a class of customers who purchased certain of Time's magazines (*Time*, *Fortune*, and *Real Simple*) through online subscription agents.[1] Specifically, Coulter-Owens paid $2 for a one-year weekly subscription of presumably 52 issues. (This price was not per issue, but $2 total for the entire year, of which the subscription agent did not pay any of the $2 to Time, so Time received no reimbursement for the magazine it was sending to Coulter-Owens for an entire year.) Time shared the order information with Acxiom and Wiland without Coulter-Owens's prior consent. Coulter-Owens sued in federal court, claiming an

---

[1] The certified class comprises "[a]ll Michigan residents who between March 31, 2009 and November 15, 2013 purchased a subscription to *TIME*, *Fortune*, or *Real Simple* magazines through any website other than Time.com, Fortune.com, and RealSimple.com." R. 117.

invasion of privacy in violation of Michigan's Preservation of Personal Privacy Act (PPPA),[2]

which has three provisions pertinent here.  First, Section 2:

> Except as provided in section 3 or as otherwise provided by law, a person, or an employee or agent of the person, engaged in the business of selling at retail . . . written materials . . . shall not disclose to any person, other than the customer, a record or information concerning the purchase, lease, rental, or borrowing of those materials by a customer that indicates the identity of the customer.

Mich. Comp. Laws § 445.1712, Sec. 2 (effective 3/9/89 until 7/31/16, when amended) (footnote

omitted).

> Section 3 provides the enumerated exceptions:
>
> A record or information described in section 2 may be disclosed only in 1 or more of the following circumstances:
>
> (a) With the written permission of the customer.
>
> (b) Pursuant to a court order.
>
> (c) To the extent reasonably necessary to collect payment for the materials or the rental of the materials, if the customer has received written notice that the payment is due and has failed to pay or arrange for payment within a reasonable time after notice.
>
> (d) If the disclosure is for the exclusive purpose of marketing goods and services directly to the consumer. The person disclosing the information shall inform the customer by written notice that the customer may remove his or her name at any time by written notice to the person disclosing the information.
>
> (e) Pursuant to a search warrant issued by a state or federal court or grand jury subpoena.

Mich. Comp. Laws § 445.1713, Sec. 3 (effective 3/9/89 until 7/31/16, when amended) (footnote

omitted).

> Finally, Section 5, the $5,000-per-incident statutory damages provision (since repealed):
>
> Regardless of any criminal prosecution for a violation of this act, a person who violates this act shall be liable in a civil action for damages to the customer identified in a record or other information that is disclosed in violation of this act. The customer may bring a civil action against the person and may recover both of the following:

---

[2] The district court and Time refer to this statute as the VRPA, i.e., "Video Rental Privacy Act."

> (a) Actual damages, including damages for emotional distress, or $5,000.00, whichever is greater.
>
> (b) Costs and reasonable attorney fees.

Mich. Comp. Laws § 445.1715, Sec. 5 (effective 11/7/89 until 7/31/16, when amended). Coulter-Owens and the rest of the class of approximately 40,000 subscribers disclaimed any "actual damages" and instead sought $5,000 each (about $220 million total) in statutory damages.

Just to be clear before moving on, Coulter-Owens is not complaining about Time's selling her information under its "list rental business," which would fall within the "direct marketing exception" of § 1713(d). Coulter-Owens is suing Time for submitting this order information (name, address, and magazine choice) into Acxiom's and Wiland's giant stew of personal information already in their possession, such as her gender, race, age, education, employment, political affiliation, hobbies, etc., furthering a larger dossier on her. For example, Time submits her name, current address, and that she just subscribed to Time magazine, and gets back (hypothetically) a dossier of her age, gender, race, education level, employment history, or other hobbies and interests. With this information, Time places her on a specific list that it can sell to a business, charity, or political group interested in people with her same interests. It is this disclosure of her magazine-subscription information that she claims violates the PPPA.

In moving for summary judgment, Time argued, among other things, that it had not sold magazines to the plaintiff class members "at retail" as required by the PPPA. The district court agreed, finding that the subscription agents were "resellers" not "middlemen" so the sale was not a direct plaintiff-to-defendant sale, and granted summary judgment to Time on this basis. *Coulter-Owens v. Time, Inc.*, No. 12-cv-14390, 2016 WL 612690, at *3-4 (E.D. Mich. Feb. 16,

2016). Coulter-Owens appeals. Time cross-appeals, arguing that Coulter-Owens lacks standing, a claim that Time did not raise in the district court. [3]

**II.**

Despite Time's raising this jurisdictional claim for the first time on appeal—as a cross-appeal claim in answer to Coulter-Owens direct appeal—we address it first because "[s]tanding is a threshold question in every federal case." *Miller v. City of Wickliffe*, 852 F.3d 497, 502 (6th Cir. 2017). "[W]e review jurisdictional challenges based on standing de novo." *Barry v. Lyon*, 834 F.3d 706, 714 (6th Cir. 2016).

Time contends that Coulter-Owens lacks Article III standing because she cannot prove injury in fact for one of two reasons: (1) *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), applies here to dictate that a mere violation of the PPPA is insufficient to establish injury in fact; or (2) Michigan's 2016 *curative* or *remedial* amendment to the PPPA is retroactive and requires proof of actual damages, which Coulter-Owens is not claiming. Coulter-Owens responds that she does have an injury (and standing) because the PPPA gives her a legally protected interest in the privacy of her reading choices, which Time violated by disclosing that information to third parties. She contends that the Supreme Court's decision in *Spokeo* does not affect this case because it is not on point, and the Michigan legislature's amendments to the PPPA do not apply because they are not retroactive.

Since the district court's decision, however, three district court cases have addressed this question and found that a plaintiff does have standing under the PPPA, that *Spokeo* does not change that, and that the new PPPA is not retroactive: *Perlin v. Time Inc.*, No. 16-10635, 2017 WL 605291, at *2-3 (E.D. Mich. Feb. 15, 2017); *Moeller v. Am. Media, Inc.*, No. 16-cv-11367,

---

[3] Time also challenges the district court's certification of the class. Because of our determination of Coulter-Owens's direct appeal, however, we need not address this class-certification issue on appeal.

2017 WL 416430, at *3-4 (E.D. Mich. Jan. 27, 2017); *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 437 (S.D.N.Y. 2016). Each of these opinions is thorough and persuasive. In short, given that the PPPA contains an express private right to sue, it confers statutory standing on a person whose information was disclosed in violation of it. Moreover, the disclosure of that information is a cognizable injury in fact for purposes of Article III standing.

Here, Time argues that there is no injury because the Michigan legislature has amended the PPPA to require actual damages (repealing the $5,000-per-incident statutory damages provision) and contends that the amendment is retroactive. But under Michigan law, a statute is presumed to operate prospectively unless there is a clear manifestation of contrary intent. *Frank W. Lynch & Co. v. Flex Techs., Inc.*, 624 N.W.2d 180, 182 (Mich. 2001). In looking for intent, courts do not find retroactivity simply because a statute relates to an antecedent event, and may not find retroactivity if the new law takes or impairs vested rights under existing laws; but courts will find retroactivity from express language in the statute giving retroactive application, and may find retroactivity for a remedial or procedural act not affecting vested rights. *LaFontaine Saline, Inc. v. Chrysler Grp.*, LLC, 852 N.W.2d 78, 85-86 (Mich. 2014). The new PPPA does not contain any express statement of intended retroactivity (in fact, it contains a future "effective date"); and given the extensive substantive changes (such as excising the statutory damages provision) it cannot be viewed as merely a "clarifying" amendment intended for retroactive application. In this same way, the amendment eliminates vested rights, such as the right to sue for statutory damages. Consequently, the amendment is not actually remedial and is not retroactive.

Time also argues that the Supreme Court's recent decision in *Spokeo* dictates that the type of PPPA violation alleged here is now insufficient to constitute an injury in fact. In its simplest sense, *Spokeo*, 136 S. Ct. at 1549, held that "a bare procedural violation" of a statute,

6

"divorced from any concrete harm," does not constitute an injury in fact. But the violation at issue here is not a "bare procedural violation"; it is a violation of the PPPA's most basic substantive protection, the privacy in one's reading materials. *Spokeo* does not apply here.

Coulter-Owens and the certified class have standing.

## III.

We review the grant of summary judgment de novo, construing facts and inferences in the light most favorable to the non-moving party. *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 565 (6th Cir. 2016). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 842 F.3d 422, 426 (6th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).

Coulter-Owens contends that the district court erred by improperly deciding for itself the disputed question of material fact of whether the online subscription agents were "resellers" rather than "middlemen," and further by reaching the wrong conclusion on that question. Time replies that the district court was correct that Coulter-Owens had raised no genuine issue of material fact to support her contention that Time had sold magazines to her and the class "at retail," because they purchased the magazines from independent third-parties and, consequently, there was no "retailer-customer relationship" between Coulter-Owens and Time.

In explaining why the purchases through the third-party subscription agents were not "at retail," as meant by the PPPA, the district court focused on the "retailer-customer relationship":

> [T]he statute forbids a person '*engaged* in the business of selling at retail . . . written materials' to disclose a 'record or information concerning the purchase' if that disclosure is 'to any other person, *other than the customer*.' Mich. Comp. Laws § 445.1712 (emphasis added). . . . When reading the term 'at retail' in the context of the entire statute, it is evident that purchases by third-parties do not fall within the statute's reach. The statute permits disclosure of a 'record or information concerning the purchase' if that disclosure is to the 'customer.' . . . [T]he statute contemplates a relationship created when there is a sale 'at retail'—

7

> *i.e.*, selling goods for use not for *resale*—to a 'customer'—*i.e.*, the person purchasing the magazine from the seller. In this case, the sale was not between defendant (the retailer) and plaintiff/the proposed class members (the customer). Rather, it was a sale from the retailer to a reseller, then to the plaintiff/proposed class members. Therefore, it was not a sale 'at retail' as contemplated by the [PP]PA.

> Th[is] interpretation also makes sense when reading Section 2 of the [PP]PA in context with Section 3. Section 3 of the [PP]PA provides certain exceptions or 'allowable circumstances' of a disclosure of the customer's 'record or information.' Mich. Comp. Laws § 445.1713. For example, one allowable circumstance for disclosure is when the customer consents in writing to the disclosure. *Id.* at § 445.1712(a). For a 'customer' to consent in writing to the disclosure, the statute contemplates a retailer-customer relationship. Here, that relationship is not between plaintiff and defendant, it is between plaintiff and the third-party reseller.

*Coulter-Owens*, 2016 WL 612690, at *3-4.

Coulter-Owens argues that the subscription agents were "middlemen" (not "resellers"), so Time sold to her "at retail," and cites two Michigan cases to support her distinction between "middlemen" and "resellers." In the first case, *World Book, Inc. v. Department of Treasury*, 590 N.W.2d 293 (Mich. 1999), door-to-door encyclopedia salesmen who took orders and collected money on behalf of a publisher who then mailed the encyclopedias directly, were "middlemen." In the second case, *Michigan National Bank v. Department of Treasury*, 339 N.W.2d 515 (Mich. Ct. App. 1983), a bank that facilitated the purchase of Krugerrands for a customer by negotiating a price with a coin dealer and, upon agreement by the customer, obtaining the Krugerrands from the dealer before providing them to the customer at the negotiated price plus commission, was a "reseller." According to Coulter-Owens, the intermediary is a "reseller" (and itself engaged in sale "at retail") only if it takes physical possession of the goods being sold. She points to the deposition of Time's Vice President of Marketing in which he agreed that the subscription agents did not take possession of any magazines or pre-purchase some amount of subscriptions in order to re-sell them; they merely sold orders to be filled directly by Time. From this, Coulter-Owens says that a jury could find

that the subscription agents were merely "middlemen" and thus it was Time that was selling "at retail."

Time glosses over the middleman/reseller distinction and contends that *World Book* and *Michigan National Bank* are inapposite, citing cases that found a third-party to be a reseller even without taking physical possession. *See Louisville/Jefferson Cty. Metro Gov't v. Hotels.com*, 590 F.3d 381, 389 (6th Cir. 2009) (finding Hotels.com a "reseller" though it remitted payment to the hotel from the customer). Time takes a different view altogether and insists that, "[t]o be a retailer, the entity must interact with the customer at the time of purchase"—which Coulter-Owens admits did not happen.

Before resolving this "at retail" dispute, however, we can dispose of Coulter-Owens's claim that summary judgment was improper because the question of whether the subscription agents were "middlemen" or "resellers" was a question of material fact for a jury. It was not. There is no dispute about how the transaction occurred: Coulter-Owens went to a subscription agent's website (e.g., Magazines.com), ordered a magazine subscription, and paid for it with a credit card; the subscription agent confirmed the order with Coulter-Owens, paid any applicable sales tax to the government, and sent Coulter-Owens's order information to Time with instruction to fulfill the order; Time received the order from the subscription agent and filled it, using the order information that the subscription agent had provided. The remaining question was a legal one: given these facts, is the subscription agent a "middleman" or a "reseller," as the law defines it? There was no disputed fact for a jury to decide based on witness testimony, competing evidence, expert opinion, etc. This was a proper issue for summary judgment.

But the real question (the purely legal question) is whether the sale was "at retail," as the law defines it, and we agree with Time that the middleman/reseller distinction is not dispositive. The question, instead, is what "at retail" meant in the PPPA, Mich. Comp. Laws § 445.1712,

9

Sec. 2 (effective 3/9/89 until 7/31/16). One might find it odd to think that the Michigan legislature intended to penalize the disclosure of this information by the subscription agents but not by the publisher (Time), even though (1) the subscription agent would have to disclose this information to Time to fulfill the order and (2) the PPPA would prevent the disclosure by Time if Time sold the same subscription directly from its own website. It is perhaps likely that the legislature intended to regulate any company that sells to the public (as Time does). But because the statute specifically includes the phrase "at retail," it necessarily excludes nonretail sales (and nonretail sellers). Some types of sale, and sellers, are nonretail and it is not unreasonable to conclude that the intermediary subscription agent as used in this case renders Time a nonretail seller.

> Whatever nonretail sellers are, it is possible that the PPPA could have further advanced Michigan's aims by reaching them, but 'a State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns.' As it stands, the law restricts those most likely to have protected information.

*Boelter v. Advance Magazine Publishers Inc.*, 210 F. Supp. 3d 579, 600-01 (S.D.N.Y. 2016) (quoting *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1668 (2015)).

The PPPA includes the phrase "at retail." That phrase has to mean something and at a minimum it means that some types of sales must be "nonretail," which are consequently excluded. There were two sales here: Time's sale to the subscription agent and the subscription agent's sale to Coulter-Owens. Because Coulter-Owens is the end consumer, the sale to her was necessarily "at retail"; the sale from Time to the subscription agent here was not "at retail" under the facts of this case. The district court was correct that the PPPA does not govern this sale.

## IV.

For the foregoing reasons, we AFFIRM the judgment of the district court.