FRIDLUND SECURITIES COMPANY
and Scott Fridlund, Relators
(C5–88–240)—Respondents (C8–88–331),

v.

The MINNESOTA COMMISSIONER OF
REVENUE, Respondent
(C5–88–240)—Relator (C8–88–331).

Nos. C5–88–240, C8–88–331.

Supreme Court of Minnesota.

Oct. 7, 1988.

Larry M. Wertheim, Steven T. Hetland, Minneapolis, for Fridlund Securities and Scott Fridlund.

Hubert H. Humphrey, III, Atty. Gen., James W. Neher, Thomas R. Muck, Dept. of Revenue, St. Paul, for Minnesota Com'r of Revenue.

YETKA, Justice.

Fridlund Securities Company and its sole shareholder, Scott Fridlund (hereinafter referred to together as "taxpayer") appeal an assessment of a sales tax liability made by the Commissioner of Taxation to the Minnesota Tax Court, which affirmed the tax. We affirm the tax court.

Scott Fridlund is a licensed stockbroker and sole shareholder of Fridlund Securities Company, a Minnesota corporation located in Moorhead, Minnesota. Fridlund Securities Company is a registered broker-dealer and handles transactions involving common stock, mutual funds, money market instruments and commodities, including precious metals. From December 1979 through October 1983, taxpayer handled numerous transactions involving precious metals. Based on these transactions, the commissioner assessed sales tax liability of more than $125,000, including penalties and interest, against taxpayer under Minn.Stat. § 297A.02, subd. 1 (1986).[1]

Although the relevant time period for the sales tax liability ended in October 1983, the commissioner's order assessing tax liability was not issued until March 1986. According to a staff attorney for the commissioner, during a meeting in early 1984, the parties agreed, at the request of Scott Fridlund and his attorney, to postpone collection activities in this case until this court rendered its decision in *Northwest Territories Gold and Silver Exch., Inc. v. Comm'r of Revenue*, 377 N.W.2d 448 (Minn.1985). Although Scott Fridlund agrees that a meeting concerning the sales tax liability was conducted in early 1984, he states that neither he nor his attorney requested a postponement of collection activities.

Taxpayer appealed the assessment order to the tax court. The parties submitted the case to the tax court on the following stipulated facts:

1. The taxable periods in question are 12-79, 1-80, 3-80 through 7-80, 9-80 through 3-81, 5-81 through 3-82, 7-82 through 10-83.

2. Sales tax for the aforementioned periods, exclusive of penalty and interest, has been assessed against Fridlund Securities Company ("Fridlund Securities") and Scott Fridlund in the amount of $65,-408.18.

\* \* \* \* \* \*

4. Fridlund Securities is a licensed securities broker-dealer under Minnesota and Federal law.

5. Scott Fridlund is President and sole shareholder of Fridlund Securities.

6. At all times relevant herein, Fridlund Securities maintained an office at Moorhead, Minnesota.

7. As part of its business, Fridlund Securities regularly conducted precious metal transactions including transactions

---

1. Although the corporation handled the transactions, Scott Fridlund was assessed personal liability for the taxes based on Minn.Stat. § 270.10, subd. 4 (1986) and Minn.Stat. § 297A.01, subd. 2 (1986), which, together, provide that a corporate officer may be personally liable for the corporation's tax liability.

underlying the assessed sales tax in question.

8. The following are the steps which took place with regard to each precious metal transaction in question:

(a) A customer contacted Fridlund Securities to inquire about purchasing a certain type of precious metal.

(b) Fridlund Securities contacted A–Mark Precious Metals Incorporated, a precious metals seller located in Beverly Hills, California, to inquire about the current price of the precious metal.

(c) Fridlund Securities informed the prospective customer as to the current price for the precious metal.

(d) If satisfied with the price, the customer ordered the precious metal and paid a specific amount consisting of the base cost of the precious metal, the shipping costs, and an additional amount ultimately paid to Fridlund Securities. Payment was made either in cash or by check payable to Fridlund Securities.

(e) Fridlund Securities contacted A–Mark and placed the customer's precious metal order.

(f) The customer's full payment was deposited in an account at a banking institution located in Moorhead, Minnesota, the account's title being "Special Account For The Exclusive Benefit Of Customers; Fridlund Securities Co." At all times relevant herein, Scott Fridlund had signature privileges with respect to this account.

(g) A–Mark was paid the base cost for the precious metal and the shipping cost by a check or wire transfer drawn on the aforementioned bank account.

(h) Fridlund Securities was paid the aforementioned additional amount with respect to the precious metal transaction by a check drawn on the aforementioned bank account.

(j) [sic] A–Mark shipped the precious metal to the aforementioned banking institution in Moorhead, Minnesota or to the Moorhead Post Office.

(k) Upon arrival of the precious metal in Moorhead, the customer would be informed by Fridlund Securities and would obtain possession of the precious metal.

(l) In some cases A–Mark commenced shipment of the precious metals prior to payment therefor. In other cases A–Mark commenced shipment of the precious metals subsequent to payment therefor.

9. In an undetermined number of the precious metal transactions in question, more than 20 days elapsed from the date of purchase of the precious metal and the date when the precious metal was delivered either to the banking institution at Moorhead, Minnesota or to the Moorhead Post Office.

In addition to the stipulation of facts, the parties submitted the depositions of 18 persons, including: Scott Fridlund; David Ellingson, an employee of taxpayer; Donald Haugen, an accountant for taxpayer; Nancy Messerschmidt, an employee of the banking institution referred to in paragraph 8(f) of the stipulated facts; and 14 purchasers of precious metal.

The parties also submitted a copy of the agreement between taxpayer and A–Mark Precious Metals, Inc. This standard form contract, which was prepared by A–Mark, provides that "Customer [taxpayer] represents to [A–Mark] that all purchases of metal by Customer will be for resale by customer." The agreement also makes clear that, from A–Mark's perspective, it is only dealing with taxpayer and not taxpayer's customers. Specifically, the agreement provides: "Customer is always 100% responsible for any order placed with [A–Mark]. [A–Mark] only contracts with customer and not with customer's clients."

On these facts, taxpayer argued that it did not make taxable retail sales of precious metal within the meaning of Minn. Stat. § 297A.01, subd. 3 (1986). In the alternative, taxpayer argued that a certain number of transactions, in which delivery of the metals occurred more than 20 days after the purchase, constituted investment metal contracts within the meaning of Minn.Stat. § 80A.14, subd. 12(ii) (1986). As

such, these transactions involved intangible property which is not subject to sales tax.

On December 7, 1987, the tax court issued its factual findings and legal conclusions and affirmed the commissioner's order. The judge's factual findings were essentially identical to the stipulated facts, with only a few exceptions. First, in paragraphs 8(d), 8(g), 8(h), and 8(*l*) of the stipulation of facts, the judge included or altered language to indicate that the purchasers of the metals paid the sale price to taxpayer and that taxpayer paid A–Mark for the metals.[2] Second, while the stipulated facts stated that Scott Fridlund had "signature privileges" with respect to the bank account into which payments for the metals were deposited, the tax court's factual finding stated that Scott Fridlund had "deposit and withdrawal privileges" with respect to the account. Finally, while the stipulated facts merely stated that, on the metal's arrival in Moorhead, "the customer would be informed by Fridlund Securities and would obtain possession of the precious metal," the tax court found further that an employee of taxpayer would pick up the metal from its point of delivery and either deliver it to the customer or take it back to taxpayer's office.

In its conclusions of law, the tax court ruled that none of the transactions in question were sales of investment metal contracts under Minn.Stat. § 80A.14, subd. 12(ii) (1986) and that all of the transactions were taxable retail sales in the regular course of business. Thus, the commissioner's order assessing sales tax liability in the amount of $65,480.18, plus penalty and interest, was affirmed.

On January 27, 1988, on taxpayer's motion, the tax court issued amended findings of fact and conclusions of law. Relevant amendments to the December 7, 1987 findings of fact included: (1) specification of the penalty and interest assessed by the commissioner in the respective amounts of $15,591.43 and $46,221.46; (2) a finding that taxpayer "had reasonable cause to believe that the courts might determine that no sales tax was due on the transactions that have become the subject of this litigation." Amendments to the December 7, 1987 conclusions of law included an abatement of the penalty assessment and the interest that had accrued on the penalty assessment. The tax court refused to amend its factual findings to conform to the stipulation of facts as requested by taxpayer. The court explained that its findings more accurately stated the facts as found in the depositions. The taxpayer challenges the assessment of the sales tax with interest and the commissioner challenges the abatement of the penalty assessment.

The issues raised on appeal are:

1. Is there sufficient evidence in the record to support the tax court's factual findings that deviated from the stipulation of facts?

2. Did the taxpayer make "sales" at retail within the meaning of Minn.Stat. § 297A.01, subd. 3 (1986) when it handled precious metal transactions in the course of its securities business?

3. Did a certain number of taxpayer's precious metal transactions constitute non-taxable sales of "investment metal

---

**2.** Paragraph 8(d) of the stipulation of facts stated that "the customer ordered the precious metal and paid a specific amount consisting of the base cost of the precious metal, the shipping costs, and an additional amount ultimately paid to Fridlund Securities." The tax court's factual findings stated that "the customer * * * paid a specific amount *to Fridlund* consisting of the base cost * * *, the shipping costs, and an additional amount ultimately *retained by* Fridlund." (Emphasis added.)

Paragraph 8(g) of the stipulation of facts stated that "A–Mark was paid the base cost for the precious metal and the shipping cost * * *." The tax court's factual finding stated that *"Frid-*

*lund paid to* A–Mark both the base cost and the shipping cost * * *." (Emphasis added.)

Paragraph 8(h) of the stipulation of facts stated that "Fridlund Securities was paid the aforementioned additional amount * * *." The tax court's factual finding stated that "Fridlund *paid itself* the additional amount * * *." (Emphasis added.)

Finally, paragraph 8(*l*) of the stipulation of facts stated: "In some cases A–Mark commenced shipment * * * prior to payment therefor." The tax court's factual findings stated: "In some cases A–Mark commenced shipment * * * prior to payment therefore *by Fridlund*." (Emphasis added.)

contracts" within the meaning of Minn. Stat. § 80A.14, subd. 12(ii) (1986)?

4. Did the tax court properly abate the penalty assessment against taxpayer?

5. Is taxpayer entitled to an abatement of interest on the sales tax based on a 2–year delay in tax collection activities?

The State of Minnesota imposes a tax of 6% on all retail sales made by any person in this state. Minn.Stat. § 297A.02, subd. 1 (1986). Subject to a few exceptions not applicable in this case, the seller is obligated to collect the sales tax imposed under section 297A.02. Minn.Stat. § 297A.03, subd. 1 (1986). When no sales tax is paid under section 297A.02, a 6% use tax is imposed on the purchaser under Minn.Stat. § 297A.14 (1986). In this case, the tax court was asked whether, on stipulated facts, taxpayer made retail sales and, therefore, was obligated to collect a sales tax under sections 297A.02 and 297A.03. The tax court made factual findings not entirely in conformity with the stipulated facts and concluded that taxpayer was liable for the sales tax. This court has adopted a standard of review of the tax court's factual findings limited to determining whether sufficient evidence of record exists to support the findings. *Nagaraja v. Comm'r of Revenue*, 352 N.W.2d 373, 376 (Minn.1984). This court has plenary power, however, with respect to questions of law. *Id.*

Taxpayer contends that the tax court's factual findings are not supported by the evidence to the extent they deviate from the stipulation of facts. First, taxpayer argues that there is no evidence in the deposition testimony to support the tax court's alterations in paragraphs 8(d), 8(g), 8(h) and 8(*l*) of the stipulation of facts. These alterations essentially stated that the purchasers paid the total sales price to taxpayer and taxpayer paid A–Mark for the precious metal.

■ Contrary to this argument, however, certain deposition testimony clearly supports a finding that the customer paid the purchase price to taxpayer. For example, Bernard Nordick testified that he paid for the precious metal by mailing a check to Fridlund Securities; Howard Noyes testified that he paid for the precious metal by giving money to Dave Ellingson, a Fridlund employee; Donald Koep testified that he would place an order for silver over the phone and pay for it by sending a check to Fridlund Securities; Kyle Anderson testified that he paid no company other than Fridlund; Austin Culp testified that he paid for metal purchases by sending a check to Fridlund Securities. This testimony supports the tax court's finding that the purchase price was paid to taxpayer.

In addition, the testimony of Nancy Messerschmidt further supports the tax court's factual findings indicating that it was taxpayer who paid A–Mark. Messerschmidt, a bank employee, handled taxpayer's account titled "Special Account For The Exclusive Benefit Of Customers; Fridlund Securities Co." She testified that payment for precious metals delivered from A–Mark to the bank was made through the use of a sight draft drawn on the special account and signed by taxpayer. She testified further that "Fridlund Securities Company [was] the payer" with respect to the draft and A–Mark was the payee.[3] In addition, there is no question that whenever money was transferred from the special account to A–Mark, it was done on taxpayer's order. Taxpayer's customers had no knowledge of this special account or the method by which taxpayer obtained the metal. Thus, to the extent the tax court deviated from the stipulated facts to indicate that taxpayer paid A–Mark for the metals, there is deposition testimony to support such findings.

■ The second factual finding that taxpayer contends is unsupported by the evidence is the tax court's finding that Scott Fridlund had "deposit and withdrawal privileges" on the special account as opposed to the stipulated fact that he had "signature privileges." However, the testimony of

---

**3.** Perhaps due to a lack of first-hand knowledge, Scott Fridlund, at one point, testified that he did not recall the use of sight drafts.

Donald Haugen, taxpayer's accountant, supports the tax court's use of the term "deposit and withdrawal" privilege. Haugen testified as follows:

Q. With respect to the exclusive benefit account Fridlund Securities had what is called depository right or a signature right?

A. Correct.

Q. Did that mean Fridlund Securities could deposit and withdraw at will?

A. They certainly could have. * * *

This testimony supports the tax court's finding that taxpayer had "deposit and withdrawal" privileges. Clearly, the deposition testimony supports the tax court's deviation from the stipulated facts.

Minn.Stat. § 297A.02, subd. 1 (1986), as previously noted, imposes a 6% tax on retail sales. A "sale" is defined as "[a]ny transfer of title or possession, or both, of tangible personal property * * * for a consideration in money or by exchange or barter." Minn.Stat. § 297A.01, subd. 3(a) (1986). A "retail sale" is "a sale for any purpose other than resale in the regular course of business." Id., subd. 4. There is no dispute that if taxpayer's metal transactions constituted "sales," then such sales were "retail sales." Thus, the primary issue here is whether taxpayer's involvement in these transactions constituted a "sale."

The first element for determining if a sale occurred is whether taxpayer transferred title or possession of tangible personal property.[4] The commissioner contends, and the tax court found, that there were two transactions occurring with respect to each precious metal sale: (1) there was a sale of metal from A–Mark to taxpayer and (2) there was a resale of metal from taxpayer to its customer. Thus, it is the commissioner's position that taxpayer transferred both title to and possession of the metal. As support, the commissioner cites the agreement between A–Mark and taxpayer, which provides that taxpayer is purchasing precious metals for resale. The commissioner also cites deposition testimony of

taxpayer's customers which indicated that they were not aware of A–Mark or believed that they were dealing only with Fridlund. According to the commissioner, these facts demonstrate that taxpayer transferred title to its customers.

Taxpayer, however, argues that it never owned the precious metals and merely acted as a broker to bring together buyer and seller. Thus, taxpayer only assisted A–Mark in transferring the metals to the purchasers and never actually purchased any metal itself.

■ Both parties have persuasive arguments with respect to the transfer of title to the precious metal. Under the statute, however, a sale does not depend solely on transfer of title but, instead, requires only a transfer of title *or possession*. In this case, the tax court found, based on deposition testimony, that taxpayer's employee picked up the precious metal when it arrived in Moorhead and either brought it back to taxpayer's office or delivered it to taxpayer's customer; taxpayer concedes this fact. In addition, according to the testimony of a bank employee, the bank would only release the precious metal to taxpayer. Clearly, taxpayer obtained possession of the precious metal and transferred possession of the metal by delivering it to its customers.

Taxpayer, nevertheless, seeks to mitigate the significance of its employees picking up the metal by arguing that it only had "temporary possession," which was insufficient to trigger sales tax liability. Analogizing the law of conversion, taxpayer argues that, in order to be liable for sales tax, one must exercise dominion and control over an item. Further, taxpayer states that a sale implies "one is giving up ownership." According to taxpayer, sales tax liability is inappropriate here because taxpayer did not have sufficient possession.

■ The plain language of the statutory definition of "sale" requires only a transfer of possession. Taxpayer's argument that

---

4. The parties agree that sales of precious metals are sales of tangible personal property. *See*

something more than mere possession, *i.e.* dominion and control, is necessary contradicts the plain language in the statute. For this reason, the first statutory element of a sale occurred in this case: taxpayer transferred possession of tangible personal property.

The second element for determining if a sale occurred is whether taxpayer received a consideration in money for the transfer of tangible personal property. While the first element—the transfer of possession—seemed clearly met, this second element is less clear. Both parties have compelling arguments.

The commissioner contends that the facts clearly show that taxpayer's customers paid the full purchase price to taxpayer, which satisfies the requirement that taxpayer has received consideration for the transfer. Taxpayer does not dispute the fact that its customers paid the sales price to taxpayer and not A–Mark. However, taxpayer contends that the "consideration" referred to in the statutory definition of "sale" relates to the base cost of the precious metal and does not include a commission. Further, because taxpayer only retained its commission and was obligated to pass along the base cost of the precious metals to A–Mark, taxpayer did not actually transfer the precious metals to its customers for consideration. In other words, the consideration went to A–Mark, not taxpayer.

Taxpayer's argument that it did not receive the "consideration" required by the statute is premised on its use of what it calls a "trust account." Taxpayer claims that, although its customers delivered to it cash and checks payable to taxpayer, it was obligated to place these funds in a special account. Taxpayer says these funds remained the property of the customer until such time as taxpayer ordered the funds transferred to A–Mark. Thus, taxpayer argues it never actually received consideration for the precious metals but, instead, only received a commission, which did not constitute "consideration" for purposes of determining whether a sale occurred.

█ Taxpayer apparently patterned the use of the special account after a type of account used in stock and other security transactions.[5] While such an account was required for any *security* distributions by taxpayer, *see* Minn. Rules § 2875.0930 (1987), it does not, contrary to taxpayer's contention, appear that taxpayer was obligated to use such an account in precious metal transactions. The statutory definition of "security"[6] generally includes evidence of indebtedness such as notes, stocks, bonds and debentures. Precious metals, as tangible personal property, would not appear to fit within the definition of "security" nor are they investment metal contracts under Minn.Stat. § 80A.14, subd. 12 (1986). See discussion *infra* at 162–164. Therefore, transactions involving precious metals would not be subject to the

---

**5.** Donald Haugen testified that this type of account is known as an "AK2A account" and is for the purpose of protecting brokers' clients who have given the broker money for the purchase of a security. According to Haugen, the law requires fully disclosed brokers to place the money in this type of account so that the brokers' creditors could not reach it. The money remains in the account until such time as the seller of the stock or other securities is entitled to it. Haugen testified that taxpayer is a fully disclosed broker and is thus required to use this type of account in security transactions. *See* Minn. Rules § 2875.0930 (1987). Haugen explained that a fully disclosed broker is an introducing broker. Introducing brokers do not have a seat on a stock exchange and do not actually buy or sell stock. Instead, they "introduce" their customers to brokers who do have a seat on an exchange and actually make stock purchases.

**6.** Minn.Stat. § 80A.14, subd. 18(a) (1986) states: "Security" means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit sharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable shares; investment contract; investment metal contract or investment gem contract; voting trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas or mining right, title or lease or in payments out of production under the right, title or lease; or, in general, any interest or instrument commonly known as a security, or any certificate of interest or participation in, temporary or interim certificate for, receipt for guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. * * *

regulation requiring the use of a special account.

The actual use of the account appears to have differed from those accounts used in security transactions in any event. Taxpayer's accountant noted that, with respect to the accounts for stock or security transactions, taxpayer could only withdraw funds at the request of the customer. However, with respect to the special account involving metal transactions, taxpayer "could deposit and withdraw at will." Furthermore, as commissioner notes, taxpayer's argument that it was required to use this special account is inconsistent with the fact that the precious metal transactions were not registered as security transactions. In short, it does not appear that taxpayer had to place any payments received from its customers for metal purchases into a special account ear-marked for A–Mark.

This discounts taxpayer's argument that it never actually received consideration for the precious metals, but that, instead, the money it received merely went on to A–Mark. Taxpayer quoted a total sales price to its customers (consisting of base cost, shipping cost, and an additional amount for taxpayer) and received cash or checks for that total sales price. Taxpayer was, at that time, in a position to collect a sales tax from the funds received from its customer. Taxpayer should not be allowed to avoid its collection obligation by placing the funds in what it calls a "trust account" and then using those funds to pay the base cost of the item sold.

■ For the reasons set out above, we find that both elements of the statutory definition of "sale" are present in the transactions involved herein. In making this finding, there is adequate evidence that the legislature intended to place a collection duty on a person or business such as taxpayer. Presumably, the legisla-

ture only intended to require a person to collect a sales tax if that person had the opportunity to do so. The legislature probably did not intend to require collection by a person who never had possession of the goods or possession of the money involved in the transaction. Contrary to taxpayer's contention, this taxpayer did have control over the payments received from its customers and did have an opportunity to set aside the sales tax from these funds. In short, taxpayer would seem to be a type of person or business upon whom the legislature intended to place a duty to collect sales taxes.[7]

Taxpayer contends that, even if its precious metal transactions are found to be retail sales subject to taxation, an uncertain number of these transactions were "investment metal contracts" under Minn. Stat. § 80A.14, subd. 12(ii) (1986) and were exempt from taxation. The tax court held that none of taxpayer's precious metal sales were investment metal contracts under Minn.Stat. § 80A.14, subd. 12(ii) (1986). On appeal, taxpayer asserts that the tax court misconstrued the meaning of the phrase "for the future delivery" contained in section 80A.14, subdivision 12(ii) (1986) and thus misapplied the statute. In deciding this issue, the intended meaning of the phrase "for the future delivery" must be determined.

Minn.Stat. § 80A.14, subd. 12(ii) (1986) reads in relevant part:

"Investment metal contract" * * * means:

\* \* \* \* \* \*

(ii) a contract of purchase or sale which provides *for the future delivery* of an investment metal * * *

\* \* \* \* \* \*

"Investment metal contract" * * * *shall not include*:

\* \* \* \* \* \*

<hr>

7. The facts of this case might be compared to a hypothetical wherein taxpayer did not receive cash or checks payable to itself but, instead, was given a check *payable to A–Mark*. Clearly, taxpayer would have no opportunity to set aside funds for a sales tax, but could only pass the check along to the payee, A–Mark. Under that hypothetical, taxpayer would not be in a position to collect the sales tax and, therefore, could not be said to have received consideration within the meaning of the statute defining "sale."

(iii) the sale of an investment metal * * * where full payment is made to the seller, and *delivery* of the investment metal * * * is made to the purchaser, or to a bank * * * [or] broker-dealer * * * *within 20 days of the date of purchase* * * *

*Id.* (emphasis added).

The tax court found that the phrase "for the future delivery" contained in Minn.Stat. § 80A.14, subd. 12(ii) had a "long-established" meaning.[8] The tax court determined that the phrase "for the future delivery" pertained to sales where delivery of a purchased item is made on a specific day or month in the future chosen by the seller and which are conducted in the context of "hedging" with respect to market price fluctuations. The tax court found that none of taxpayer's customers had contracted for this type of delivery. Rather, taxpayer's customers purchased precious metals outright and took delivery as soon as practicable. Additionally, the tax court held that Minn.Stat. § 80A.14, subd. 12(iii) (1986), which excludes from the definition of an investment metal contract any sale where the full price is paid and delivery takes place in 20 days, does not, by itself, define what is an investment metal contract and merely acts as a safe harbor for those wishing to avoid registration.[9]

In its appeal, taxpayer does not dispute that its metal sales are not sales for future delivery as defined by the tax court. What taxpayer does dispute is the court's definition of the phrase "for the future delivery." Taxpayer contends that the tax court mistakenly ascribed a "technical" meaning to the phrase "for the future delivery" rather than a common, ordinary meaning as the legislature intended. Taxpayer supports this contention by referring to another provision of Minn.Stat. § 80A.14, subd. 12 (1986), which provides:

"Investment metal contract" * * * means:

* * * * * *

(iii) a sale of an investment metal * * * pursuant to a contract known to the trade as a margin account, margin contract, leverage account, or leverage contract.

Taxpayer argues that this provision demonstrates that the legislature knew how to incorporate a technical definition of a specific type of sales contract. Therefore, the taxpayer reasons, if the legislature had intended to use a trade or technical meaning of the term "for the future delivery," it would have expressly indicated it as it did in another provision of the same statute. Taxpayer then cites Minn.Stat. § 645.08(1) (1986) for the proposition that, since the phrase "for the future delivery" is not limited to a technical or special meaning, it should be construed according to its "common and approved usage." Taxpayer would then give the "common and approved usage" of the phrase "for the future delivery" a very literal reading, extending it to cover transactions where delivery was made anytime after purchase.

In discerning legislative intent, as with resolving an ambiguity in a statute, it is proper to consider contemporary legislative history. *Application of Gau*, 230 Minn. 235, 238, 41 N.W.2d 444, 447 (1950); Minn. Stat. § 645.16 (1988). One accepted method of considering contemporary legislative history is listening to tapes of the legislature's proceedings. *Handle With Care, Inc. v. Dep't of Human Serv.*, 406 N.W.2d 518, 522 (Minn.1987). Although statements found on legislative tapes should be used with caution, statements by a sponsor of a bill or amendment on the purpose or intent of the statute are entitled to some weight. *Id.* The following is a verbatim statement by Senator Steve Keefe, sponsor of the investment metal contract amendment, the

---

8. The tax court cited two foreign opinions, *John Miller Co. v. Klovstad*, 14 N.D. 435, 105 N.W. 164 (1905), and *Arkansas Cotton Growers Co-op Ass'n v. Brown*, 168 Ark. 504, 270 S.W. 946 (1925), as authority for its definition of a sale for future delivery.

9. This holding is not disputed on appeal. Taxpayer's only claim concerning this portion of Minn.Stat. § 80A.14, subd. 12 (1986) is that it acts with section 80A.14, subdivision 12(ii) (1986) to exempt from taxation precious metal sales where delivery occurred 20 days after purchase.

present Minn. Stat. § 80A.14, subd. 12, to the state security laws. Speaking on the problems which necessitated the bill, Senator Keefe stated:

> What happens is that they [dealers] sell you gems or metals but they won't give it to you and then you are eventually supposed to sell it at a profit. Except that because they control it and because they are the only ones you can sell it to, time comes when they call your margin account, and you have to sell to them and strangely enough you don't make a profit, but a loss.

Senator Steven Keefe, Senate Labor and Commerce Committee Hearing, April 29, 1975. Later in the same tape, while reading the definition of an "Investment Metal Contract," Senator Keefe expanded on the meaning of "for the future delivery" by stating: "[When you] buy it [the metal] now and they plan to deliver it in the future or maybe not at all." *Id.*

The two passages cited above reflect the legislature's concern about precious metal sales where the seller retains control of the precious metal for a period of time after the purchase for the seller's benefit and to the detriment of the buyer. This indicates that the legislature was more concerned with regulating metal sales involving a future delivery under the "technical" sense of the word as used by the tax court rather than sales where delivery is held up by payment and shipping delays, as in taxpayer's transactions.

 Based on all the above material, we affirm the tax court's holding that none of taxpayer's metal sales constituted investment metal contracts under Minn.Stat. § 80A.14, subd. 12 (1986), thus subjecting these transactions to sales taxation. In addition, we uphold the tax court's definition of the term "for the future delivery" contained in Minn.Stat. § 80A.14, subd. 12(ii) (1986) as consistent with the legislative intent.

In its amended findings of fact and conclusions of law, the tax court abated in full the $15,591.43 penalty assessed against taxpayer. The tax commissioner appeals, contending that the tax court erred in finding that reasonable cause existed and in applying the reasonable cause standard. However, before addressing these contentions, it will be necessary to determine if the tax court had jurisdiction to review the penalty assessment, an issue neither party has addressed.

Both taxpayer and commissioner state that the proper standard to use in reviewing penalty abatements is Minn.Stat. § 270.07, subd. 1 (1986), which provides: "The commissioner may by written order abate, reduce, or refund any penalty or interest imposed by any law relating to taxation, if in the commissioner's opinion the failure to timely pay the tax or failure to timely file the return is due to reasonable cause."[10] However, it appears that both parties neglected to read the statute further where they would have found the following:

> An appeal *may not be taken to the tax court* from any order of the commissioner of revenue made in the exercise of the discretionary authority granted in this subdivision in response to a taxpayer's application for an abatement, reduction or refund of taxes, assessed valuations, costs, penalties or interest.

Minn.Stat. § 270.07, subd. 1 (1986) (emphasis added).

Two early tax court cases found that the above provision precluded tax court review

---

**10.** For the transactions occurring from October 1979 to March 1982, both parties state in their briefs that Minn.Stat. § 297A.39, subd. 2 (1980), which allowed the commissioner to assess penalties "unless it is shown that such failure [to file or pay sales taxes] is not due to willful neglect," provides the proper standard for abating the penalty assessed on these transactions. (Commissioner's Brief at 36, Fridlund's Reply Brief at 16) The tax court's use of the reasonable cause standard of section 270.07, subdivision 1 in evaluating the penalty on these transactions appears to be proper, as the relevant portions of the statute were the same then as now. Even if the tax court used the wrong standard, its error is harmless. A finding of reasonable cause would seem to preclude a finding of willful neglect under the same facts. *See Wallace Schoeb v. Robert Cowles,* 279 Minn. 331, 336, 156 N.W.2d 895, 898 (1968) ("a correct decision will not be reversed on appeal simply because it is based on incorrect reasons").

of a commissioner's abatement decisions under section 270.07, subdivision 1 (1986). *See Sicard v. Comm'r of Revenue,* No. 2393 (Minn. Tax, May 25, 1977) [available on WESTLAW, 1977 WL 969]; *Gove v. Comm'r of Taxation,* No. 1570 (Minn. Tax, Jan. 4, 1973) [available on WESTLAW, 1973 WL 103].

However, the latest tax court opinion on this issue provides a better rule. In *Combustion Eng'g, Inc. v. Comm'r of Revenue,* No. 2991 (Minn. Tax, May 12, 1981) [available on WESTLAW, 1981 WL 1478], the tax court recognized the language in section 270.07, subdivision 1 precluding appeal, but found it had been given specific statutory authority to review the commissioner's orders by Minn.Stat. § 271.05 (1986), which provides: "The tax court shall have power to review and redetermine orders or decisions of the commissioner of revenue upon appeal therefrom in cases authorized by law." Additionally, the tax court found that this review was to be *de novo* as provided in Minn.Stat. § 271.06, subd. 6 (1986) ("The tax court shall hear * * * every appeal de novo."). *See also Moorman Mfg. Co. v. The Comm'r of Revenue,* No. 2957 (Minn. Tax, May 12, 1981) [available on WESTLAW, 1981 WL 1479].

■ Based on the tax court's decision in *Combustion Eng'g, Inc.* and the need to provide some method of review for penalty assessments and abatements, we find that Minn.Stat. §§ 271.05 and 271.06, subd. 6 (1986) gave the tax court subject matter jurisdiction over the commissioner's refusal to abate the penalty and allowed for *de novo* review.

The tax court abated the penalty assessed against taxpayer, finding that taxpayer had reasonable cause to believe that a court might determine that no tax was due on its metal sales. In support of its finding that reasonable cause existed, the tax court pointed out that, at the time of the original audit in 1982, there was some uncertainty as to whether precious metals were subject to sales taxation.[11] In light of this uncertainty, the tax court ruled that taxpayer had a reasonable basis to believe that no tax was due. Under these circumstances, the tax court held that it would be inequitable to assess a penalty in addition to interest.

■ Commissioner first argues that the tax court misapplied the reasonable cause standard. Commissioner contends that the tax court should have interpreted "reasonable cause" as requiring use of "ordinary business care and prudence" as was done in *United States v. Boyle,* 469 U.S. 241, 246, 105 S.Ct. 687, 690, 83 L.Ed.2d 622 (1985). Assuming there is a difference between the tax court and the United States Supreme Court's interpretation of "reasonable cause," the present case can be distinguished from *Boyle.* In *Boyle,* the penalty was assessed for failure to file a return on a known tax liability while in the present case, the tax liability was unknown at the time of transaction. Because the "reasonable cause" standard used by the tax court appears to assess properly a taxpayer's culpability concerning an unknown tax liability, we find that the tax court properly applied the reasonable cause standard.

■ Commissioner next argues that, even if the tax court applied the reasonable cause standard properly, the evidence does not support the tax court's finding that reasonable cause existed. In support of this claim, the commissioner advances three arguments. First, the commissioner points to a provision in the contract between taxpayer and its wholesaler, A-Mark, which provides: "Customer represents to PMI that all purchases of the metal by customer will be for resale by customer." Commissioner argues that this provision and others in the contract should have put taxpayer on notice that his metal sales were retail sales subject to taxation.

The commissioner's second argument is that taxpayer, an experienced and licensed broker-dealer, should be expected to know the difference between tangible personal

---

11. *Northwest Territories Gold and Silver Exch., Inc. v. Comm'r of Revenue,* 377 N.W.2d 448 (Minn.1985), which was the first Minnesota case ruling that precious metals were tangible personal property and subject to sales taxation, was not decided until November 1985.

property subject to taxation and exempt securities, especially as the metal sales were not registered as securities.

Finally, the commissioner argues that taxpayer should not be able to claim that he had reasonable cause to believe that a court might find that the sales were not subject to taxation because at no time during the sales did taxpayer seek an opinion of the revenue department or the advice of an attorney.

In looking at the commissioner's arguments, it is doubtful whether a single provision in a long contract sufficed as notice to taxpayer that he was making sales at retail and should be paying tax; nor should taxpayer be expected to look 2 years into the future to the outcome of *Northwest Territories*. However, the commissioner's other argument has considerable merit. It is disturbing that, during the entire 4-year period that taxpayer was making these sales, he not once consulted an attorney or accountant for tax advice. Though there was no case law in Minnesota regarding precious metals as tangible personal property, a consultation with a tax attorney may likely have revealed that there was a question in this area. An interesting item to note is that, though *Northwest Territories* was the first Minnesota case to hold that precious metals were tangible personal property subject to sales taxation, the parties in that case agreed beforehand that the metal sales were tangible personal property to which sales tax applied. 377 N.W.2d at 451.

If this court were reviewing the issue *de novo*, we might consider finding that reasonable cause did not exist. However, because the court's review is limited to sufficiency of the evidence, we will not overturn the tax court. The fact that no Minnesota law existed regarding precious metals as tangible personal property at the time of taxpayer's sales provides some basis for the tax court's finding. We also hesitate to suggest that a taxpayer need consult the tax commissioner or an attorney on every business decision he or she makes. We thus uphold the tax court's finding that taxpayer had reasonable cause to believe that no tax was due and affirm the tax court's abatement of the penalty.

Taxpayer seeks abatement of a portion of the interest which accrued during a 2-year delay in collection of the tax—from January 12, 1984 to January 2, 1986. While both parties agree that the delay was made in order to await this court's decision in *Northwest Territories Gold and Silver Exch., Inc. v. Comm'r of Revenue*, 377 N.W.2d 448 (Minn.1985), there is a disagreement as to who initiated the delay. Taxpayer claims that the commissioner unilaterally decided to delay collection while the commissioner claims that taxpayer requested the delay.

In refusing to abate the interest during this 2-year period, the tax court ruled that it was irrelevant who initiated the delay, for even if the commissioner unilaterally delayed collection, this was no basis to abate interest. The tax court simply held that, because taxpayer received a benefit in retaining money which otherwise would had to have been "disgorged," taxpayer must pay interest which accrued during the 2-year delay in collection. The court then commended the commissioner for showing "restraint and fairness" in postponing collection until after *Northwest Territories* was decided.

On appeal, taxpayer contends that the court erred in refusing to abate the interest. The taxpayer first disputes the finding that it received a benefit by citing Minn.Stat. § 271.09, subd. 3 (1986), which provides:

> At the time of the taking of an appeal to the tax court, the taxpayer shall pay at least the amount of the tax or other obligation conceded by the taxpayer to be due, if any, when it becomes due provided that this shall not relieve the taxpayer from complying with any other requirements of law. * * *

What taxpayer appears to be claiming is that, under Minn.Stat. § 271.09, subd. 3 (1986), he was not obligated to pay any tax before an appeal to the tax court; therefore, as he had no obligation to pay, he did not gain any benefit from the delay in collection. Taxpayer's argument, however,

is based on a misreading of Minn.Stat. § 271.09, subd. 3 (1986). That statute is merely a condition to filing an appeal and does not operate as an alternative due date for taxes. *See also* Minn.Stat. § 271.061 (Supp.1987). Adopting taxpayer's reading of the statute would render meaningless other statutory due dates for tax payments as all disputed taxes would not be due until an appeal was taken.

The remainder of taxpayer's arguments basically states that it is inequitable to charge interest during the 2–year period collection was delayed. Taxpayer insists that the delay resulted from the unilateral action of the commissioner, but argues that, even if it did request the delay, charging interest is still unfair because implicit in any agreement would be a deferral of interest during the delay.

The resolution of this issue is made difficult by the failure of any party to supply a specific equitable or legal standard.[12] The tax court appears to decide the issue on the sole basis that taxpayer received a benefit because of the delay in collection. Taxpayer retained for 2 years the money it would have otherwise been required to pay except for the postponement of collection. Taxpayer's benefit, as the tax court pointed out, was either the interest it received on this money or the interest it would have had to pay if it had borrowed the money elsewhere.

■ A search through statutory and case law revealed only one other possible legal standard: the reasonable cause standard of Minn.Stat. § 270.07, subd. 1 (1986) used to evaluate the penalty abatement. *See* page 166, *supra*. In using the reasonable cause standard for abating the interest, it is necessary to decide at what point the reasonable cause determination should be made. The tax court found that taxpay-

er "initially" (at the time of the sales) had reasonable cause to believe that no tax was due. However, in regard to payment of interest during the delay in collection, the focal point should be just before collection was delayed. At that time, taxpayer had less cause to believe that no tax would be due: The commissioner had made a sales tax assessment against him; several cases in other jurisdictions finding such sales subject to tax had come out (*see, e.g., Michigan Nat'l Bank v. Dep't of Treasury*, 127 Mich.App. 646, 339 N.W.2d 515 (1983), and *Williams & Co. v. School Dist. of Pittsburg*, 430 Pa. 509, 244 A.2d 37 (1968)); and a case relevant to taxpayer's liability was pending in the Minnesota Supreme Court. In applying the reasonable cause standard of Minn.Stat. § 270.07, subd. 1 (1986) here, the question must be asked whether, on January 12, 1984 (the date of assessment and the start of the 2–year delay in collection), taxpayer had reasonable cause to believe that no tax, thus no interest, was due. Based on the information available to taxpayer on and after January 12, 1984, it was *not* reasonable for taxpayer to expect *not* to have to pay the tax plus interest. At the most, it was a 50–50 gamble by taxpayer that the court would decide in his favor. Taxpayer had to know that there was a chance, perhaps a strong chance, that he would be found liable for the tax. To expect taxpayer to pay interest on this tax is not unfair given taxpayer's knowledge of the risk he was taking in delaying payment.

In concluding, we affirm the trial court's finding that no basis existed to abate the interest due. Under either the trial court's determination that interest was proper because taxpayer received a benefit or under the reasonable cause standard of Minn.

---

**12.** Taxpayer cites 26 U.S.C. § 6404(e) for the proposition that the interest should be abated because of the commissioner's improper delay. 26 U.S.C. § 6404(e) provides that the secretary may, in his discretion, abate an interest assessment "attributable in whole or in part to any error or delay by an officer or employee of the Internal Revenue Service (acting in his official capacity) in performing a ministerial act * * *." *Id.* This statute fails to provide a standard for

abating the interest. First, it is a federal statute applicable to federal law; and, second, it provides relief only when delay is a result of a "ministerial act." "Ministerial" is defined as "that which involves obedience to instructions, but demands no special discretion, judgment or skill." *Black's Law Dictionary*, 5th ed. 1979. The delay in this case can hardly be said to be ministerial.

Stat. § 270.07, subd. 1 (1986), it was proper to require that taxpayer pay the interest which accrued during the 2–year delay in collection.

The tax court is affirmed.