STATE OF MINNESOTA

IN SUPREME COURT

A14-1996

Tax Court                                                                    Stras, J.
                                                    Took no part, Page and Lillehaug, JJ.

Connexus Energy et al.,

            Relators,

vs.                                                             Filed:  August 5, 2015
                                                       Office of Appellate Courts

Commissioner of Revenue,

            Respondent.

_____

Thomas R. Muck, Masha M. Yevzelman, Fredrikson & Byron, P.A., Minneapolis, Minnesota, for relators.

Lori Swanson, Attorney General, Shannon M. Harmon, Tamar N. Gronvall, Assistant Attorneys General, Saint Paul, Minnesota, for respondent.

_____

S Y L L A B U S

1.      A payment of a monthly electricity bill by a customer constitutes the consideration for a taxable sale of electricity, regardless of whether an electric cooperative later reclassifies a portion of that payment as an equity contribution.

2.      In cases in which the Commissioner of Revenue issues a refund to a taxpayer, but later determines that the refund was made in error, the 2-year statute of

1

limitations for erroneous refunds, Minn. Stat. § 289A.37, subd. 2 (2014), applies to the Commissioner's assessment of the taxpayer for the amount of the refund.

Affirmed in part, reversed in part, and remanded.

O P I N I O N

STRAS, Justice.

This case presents two questions regarding the sales-tax treatment of electric cooperatives. The first question is whether electric cooperatives may reclassify portions of monthly payments by their customers as equity contributions and receive sales-tax refunds based on the reclassification. The second question requires us to determine the applicable statute of limitations for the recovery of sales taxes erroneously refunded by the Commissioner of Revenue.

After considering both questions, the tax court concluded that the cooperatives were not entitled to a sales-tax refund. With respect to the taxability of the monthly payments made by the cooperatives' customers, the tax court concluded, and we agree, that those payments were taxable as consideration for sales of electricity. However, with regard to four of the cooperatives, we conclude, contrary to the decision of the tax court, that the Commissioner's assessments to recover sales-tax refunds are subject to the 2-year statute of limitations governing erroneous refunds, *see* Minn. Stat. § 289A.37, subd. 2 (2014), not the 3-1/2-year statute of limitations generally applicable to the Commissioner's assessment authority, *see* Minn. Stat. § 289A.38, subd. 1 (2014). We therefore affirm in part, reverse in part, and remand to the tax court for further

2

consideration of the timeliness of the Commissioner's assessments of four of the cooperatives.

I.

The relators are 16 electric cooperatives located in Minnesota and organized under Minn. Stat. ch. 308A (2014), which authorizes businesses to operate as cooperatives and provides rules governing their management.[1] In order to generate working capital and to satisfy their lenders, the cooperatives raise equity from their customers, referred to as "patrons" or "members." Before the start of each year, the cooperatives approve a budget that includes an estimate of how much they will pay for electricity from their wholesale suppliers. In order to raise a sufficient amount of equity, the cooperatives also include a line item in their budgets, designated as a "target margin," which represents the anticipated revenues in excess of operating costs and expenses.

Consistent with the practice of many electric utilities, the cooperatives bill their members at the end of each month based on the amount of electricity each member has used. The cooperatives calculate their monthly electricity rates by dividing the sum of

---

[1] The relators are Connexus Energy; Crow Wing Power and Light Co.; Federated Rural Electric Association; Kandiyohi Power Cooperative; Lake Region Electric Cooperative; Lyon-Lincoln Electric Cooperative, Inc.; McLeod Cooperative Power Association; Meeker Cooperative Light & Power Association; Mille Lacs Energy Cooperative; Nobles Cooperative Electric; Red River Valley Cooperative Power Association; Roseau Electric Cooperative, Inc.; Runestone Electric Association; Steele-Waseca Cooperative Electric; Todd-Wadena Electric Cooperative; and Wright-Hennepin Cooperative Electric Association (collectively, "the cooperatives"). The parties agreed to try the consolidated cases based on the operations of Connexus Energy and Meeker Cooperative Light & Power Association, which the parties have stipulated are representative of the activities of the other cooperatives.

their estimated expenses and the target margin by the estimated units of electricity they expect to sell. The bills itemize various charges related to the price of electric service, but they do not separately list a charge for the target margin. The cooperatives collect sales tax based on the total monthly charge to each member.

At the end of each year, if a cooperative's actual margin is positive, the cooperative converts the excess revenues into "capital credits," which are distributed to members based on the amount of electricity each member purchased during the year. These credits become the members' equity in the cooperative, and remain on the cooperative's balance sheet as equity until the credits are "retired" through repayment to the members. Because capital-credit retirement is at the discretion of the board of each cooperative and equity contributions are subordinate to a cooperative's debt, a member does not know when, or whether, the cooperative will retire the capital credit.

Based on the annual allocation of capital credits, the cooperatives filed amended sales-tax returns for tax periods spanning the years 2004-06 to recover sales taxes they had paid for the portion of the revenues that they later converted into equity. Initially, the Commissioner granted the refunds claimed on the cooperatives' amended returns. Later, the Commissioner changed her view, and accordingly assessed the cooperatives to recover the amounts she had refunded to them.

The cooperatives filed administrative appeals of the assessments, but the Commissioner denied relief. The cooperatives then appealed to the tax court, which affirmed the Commissioner's assessments following a trial. The tax court found that "[e]ach monthly transaction involved one and only one sale: a retail sale of electricity,"

4

and that "[e]ach monthly sale transaction was complete no later than when [a cooperative] received a [member's] monthly payment." The tax court further determined that the annual allocation of actual margin, which the cooperatives used to award capital credits, constituted a second transaction, "distinct from, and different in kind from" the electricity sales. Based on those findings, the tax court concluded as a matter of law that the consideration for each monthly sale of electricity was "the total price the [cooperative] stated on its bill and received from its [member] for electric service." Because the total monthly charge was the taxable "sales price" for each transaction, the cooperatives were not legally entitled to sales-tax refunds for any earnings that they later converted into equity.

In a separate order denying partial summary judgment to four of the cooperatives, the tax court concluded that certain challenged assessments were timely because the Commissioner made them within 3-1/2 years of the filing of the cooperatives' amended returns. The cooperatives timely appealed the tax court's judgment by filing a petition for a writ of certiorari with this court. *See* Minn. Stat. § 271.10 (2014).

## II.

The first question presented in this case is whether the tax court correctly determined that a member's entire monthly payment for electricity service is subject to Minnesota sales tax, even when the cooperatives convert some of those earnings into equity at the end of the year. In reviewing a tax court decision, we determine whether the "tax court lacked subject matter jurisdiction, whether the tax court's decision is supported by the evidence in the record, and whether the tax court made an error of law." *Hohmann*

5

*v. Comm'r of Revenue*, 781 N.W.2d 156, 157 (Minn. 2010). We review the tax court's factual findings for clear error and the tax court's legal determinations de novo. *Soyka v. Comm'r of Revenue*, 834 N.W.2d 711, 713 (Minn. 2013). A factual finding is clearly erroneous only if we are "left with a definite and firm conviction that a mistake has been committed." *Beck v. Cty. of Todd*, 824 N.W.2d 636, 638 (Minn. 2013) (quoting *Berry & Co., Inc. v. Cty. of Hennepin*, 806 N.W.2d 31, 33 (Minn. 2011)).

Minnesota imposes a sales tax on "gross receipts from retail sales." Minn. Stat. § 297A.62, subd. 1 (2014). A "retail sale" includes "the furnishing for a consideration of electricity, gas, water, or steam for use or consumption" within Minnesota. Minn. Stat. § 297A.61, subds. 3(e), 4(a)(2) (2014). "Gross receipts" are "the total amount received, in money or by barter or exchange, for all sales at retail as measured by the sales price." Minn. Stat. § 297A.61, subd. 8 (2014). The "sales price," in turn, is "the total amount of consideration . . . for which personal property or services are sold." *Id.*, subd. 7(a). Whether the cooperatives owed sales tax on the monthly sales of electricity depends on whether the earnings that the cooperatives later converted into equity were part of the "total amount of consideration" for which electricity was sold. If they were, as the Commissioner argues, then the entire amount charged in each monthly bill was subject to Minnesota sales tax.

The parties agree that the monthly sales of electricity are retail sales subject to sales tax. However, the cooperatives argue that, because they reclassified a portion of the members' payments as equity interests at the end of the years in question, they were entitled to sales-tax refunds on those reclassified amounts because equity contributions

6

are not taxable. The cooperatives further argue, based on the annual reclassifications, that the amount stated on a member's monthly bill does not accurately reflect the "consideration" for electricity. Instead, in their view, the amount includes "both the consideration members pay in exchange for electricity and also an equity contribution that members make in exchange for equity interests." Before addressing the broader legal question of whether the entire monthly charge is the "total amount of consideration" for electricity, we first examine the tax court's factual findings about the cooperatives' operations.

A.

Following a trial in which the parties presented evidence in support of their respective theories of the taxability of the monthly charges to members, the tax court found that each monthly transaction "involved one and only one sale: a retail sale of electricity." As the tax court noted, the monthly bills sent by the cooperatives indicated that the monthly charges were in exchange for electrical service. For example, a representative Connexus bill specified that the charges were for "Electric Service," and reported a member's total energy usage in kilowatt-hours. The bill separately listed the "Cost of Basic Service," a "Residential Energy Charge" based on the number of kilowatt-hours of energy used, and a "Power Cost Adjustment." It also described the "Total Amount Due" as the "Total Cost for Electric Service (Actual Charges)." Nothing in the bill suggested that the monthly charge was for anything other than the purchase of electrical service, such as for an equity interest or a non-electricity item. In fact, the bill itself forecloses such a reading by describing the "Total Cost" as "for Electric Service."

7

We therefore conclude that the tax court did not clearly err when it found that each monthly transaction was solely for the sale of electrical service.

The second key factual finding by the tax court was that the allocation of capital credits was a separate transaction, "distinct from, and different in kind from" the sales of electricity. Even if we were to assume a causal relationship between the monthly sales and the allocation of capital credits, the transactions take place on different cycles and involve different subjects. The allocation of capital credits is a one-time, annual, transaction that converts annual earnings into equity, whereas the billing and payment for electrical service occurs on a monthly basis. Further differentiating the two transactions is the fact that the cooperatives' calculation of their actual margin at the end of the year includes revenues and expenses from non-electricity sales, such as for home-security services. These sales were unrelated to the monthly purchases of electricity by members. Accordingly, based on the distinct cycles and subjects of the two transactions, we cannot say that the tax court clearly erred when it found that the monthly sales of electricity and the annual allocation of capital credits were separate transactions for sales-tax purposes.

B.

The tax court's factual findings support its legal conclusion that the consideration for the monthly sale of electricity "was the total price the [cooperative] stated on its bill and received from its [member]." In addition to the distinct cycles and subjects of the two transactions, the court found support for its legal conclusion in its determination that "each discrete monthly sale transaction was complete no later than when [a cooperative] received a [member's] monthly payment." We agree with the tax court's reasoning.

8

Consideration refers to "[s]omething (such as an act, a forbearance, or a return promise) bargained for and received by a promisor from a promisee." *Interstate Traffic Signs, Inc. v. Comm'r of Revenue*, 845 N.W.2d 550, 552 (Minn. 2014) (quoting *Black's Law Dictionary* 347 (9th ed. 2009)). The "total amount of consideration" for a transaction, in turn, is the "sales price," whether the purchaser provides the consideration in the form of money, barter, or exchange. Minn. Stat. § 297A.61, subds. 7(a), 8.

"A taxpayer that 'quote[s] a total sales price to its customers . . . and receive[s] [payment] for that total sales price' receives consideration for the transaction." *Interstate Traffic Signs*, 845 N.W.2d at 552 (quoting *Fridlund Sec. Co. v. Comm'r of Revenue*, 430 N.W.2d 154, 162 (Minn. 1988)). In this case, the cooperatives quoted a "total sales price" to their members on each monthly bill they sent by listing the "Total Cost for Electric Service." *See id.* Once the cooperatives received payment from a member, the retail sale of electricity for that month was complete because the cooperatives had received the total amount due in exchange for providing electrical service. *See id.* At that point, under the general provision enumerating the types of transactions that are subject to Minnesota sales tax, the consideration received by the cooperatives was taxable because it constituted the "gross receipts from [a] retail sale[]." Minn. Stat. § 297A.62, subd. 1.

The cooperatives advance two objections to the tax court's reasoning. First, the cooperatives argue that, categorically, any contribution to equity made by a member, no matter the source, cannot be subject to sales tax. Although the cooperatives describe their argument as a legal objection, it is in substance a challenge to the tax court's factual

9

finding that the monthly sales of electricity and the annual allocation of capital credits are distinct transactions, a finding that we already have concluded was not clearly erroneous. Furthermore, no one, including the Commissioner, has taken the position that the second discrete transaction—the annual allocation of capital credits—is subject to sales tax. Rather, the tax court simply concluded based on its underlying findings that the first discrete transaction—the monthly sale of electricity to members—is taxable, regardless of whether the cooperatives subsequently reclassify some of their revenues from those sales as capital credits.

The cooperatives' second objection relates to their bylaws, which they claim establish the consideration for each monthly sale of electricity. For example, Connexus's bylaws state, in relevant part, that "amounts in excess of operating costs and expenses at the moment of receipt by the [c]ooperative are received with the understanding that they are furnished by the [members] . . . as capital." The bylaws also state that they are a contract between the cooperatives and their members. According to the cooperatives, the bylaws notify members that their monthly payments are consideration for two different things: (1) monthly electrical service; and (2) the opportunity to receive a capital credit at the end of the year.

The first problem with the cooperatives' argument is that it conflicts with the tax court's findings that the monthly bills reflected only a single transaction for the sale of electricity, and that these monthly sales and the annual allocation of capital credits were separate and distinct transactions. Rather than treating the two transactions as indivisible, as the cooperatives urge us to do, the tax court effectively viewed them as distinct

10

transactions governed by separate agreements. The court determined, in a finding that we have already concluded was not clearly erroneous, that the monthly bills were a contract between the cooperatives and their members for the sale of electricity. The bylaws independently provide, pursuant to a second agreement, how the cooperatives must operate their business, including how to account for payments and margins. However, the bylaws do not set the terms for the sale of electricity. Instead, the monthly bills state the price per kilowatt-hour, which may vary depending on a number of factors, including the cost of the inputs for generating electricity. Indeed, some members never even see the bylaws before they begin to purchase electricity; they simply receive a monthly bill and begin making payments.

Even without the tax court's factual findings, however, the cooperatives' argument suffers from another flaw: the contingent nature of the capital credits. In 2001 and 2002, Connexus's members did not receive capital credits because the cooperative's revenues did not exceed its costs. At most, therefore, the bylaws create an expectation that members *may* receive equity at the end of the year, but that determination comes months after a member pays his or her monthly bill and depends on the existence of excess revenues and approval by a cooperative's board of directors. Such a speculative possibility that a member may receive something in the future is insufficient under these facts to overcome the statutory presumption that all of the consideration paid in a retail sale is taxable. *See* Minn. Stat. § 297A.665(a)(1) (2014) (creating a presumption that "all gross receipts are subject to the [sales] tax."); *id.* § 297A.665(b) (2014) (declaring that "the burden of proving that a sale is not a taxable retail sale is on the seller"). In fact, at

11

trial, the cooperatives declined to explain how allocating a capital credit reduces the taxable "sales price" of any particular sale of electricity during the year.

Accordingly, we conclude that the consideration for the monthly sales of electricity was the total price stated on the monthly bills generated by the cooperatives and paid by the members. Those payments, once received, qualified as gross receipts from retail sales that were subject to Minnesota sales tax. Minn. Stat. § 297A.61, subds. 7(a), 8.

### III.

The second question presented in this case is whether the Commissioner's assessments of four of the cooperatives were untimely.[2] The cooperatives argue that, because erroneous refunds created the deficiencies that led to the assessments, the Commissioner was required to assess the cooperatives within 2 years after the refunds. *See* Minn. Stat. § 289A.37, subd. 2 (the "erroneous-refund provision"). The Commissioner relies on a different statutory provision, arguing that she has 3-1/2 years after a taxpayer has filed a tax return to assess additional taxes, regardless of the reason for the deficiency. *See* Minn. Stat. § 289A.38, subd. 1 (the "general-assessment provision"). The question we must answer is whether the erroneous-refund provision or the general-assessment provision applies to the Commissioner's actions in this case.

---

[2] The four cooperatives are Connexus Energy, Mille Lacs Energy Cooperative, Red River Valley Cooperative Power Association, and Wright-Hennepin Cooperative Electric Association.

Determining the applicable statute of limitations is a question of statutory interpretation that we review de novo. *500, LLC v. City of Minneapolis*, 837 N.W.2d 287, 290 (Minn. 2013). "[W]e examine the essence or 'gravamen of the action' to determine which, if any, statutes of limitation apply." *Weavewood, Inc. v. S&P Home Invs., LLC*, 821 N.W.2d 576, 581 (Minn. 2012) (quoting *Portlance v. Golden Valley State Bank*, 405 N.W.2d 240, 243 (Minn. 1987)).

As the parties' arguments suggest, two separate statutes of limitation potentially apply to the Commissioner's assessments. The first, the erroneous-refund provision that the cooperatives rely on, states:

> [a]n erroneous refund is considered an underpayment of tax on the date made. An assessment of a deficiency arising out of an erroneous refund may be made at any time within two years from the making of the refund. If part of the refund was induced by fraud or misrepresentation of a material fact, the assessment may be made at any time.

Minn. Stat. § 289A.37, subd. 2. The other, the general-assessment provision that the Commissioner relies on, says that, "[e]xcept as otherwise provided in this section, the amount of taxes assessable must be assessed within 3-1/2 years after the date the return is filed." Minn. Stat. § 289A.38, subd. 1.

Either provision conceivably applies because the Commissioner's assessments in this case are both "assessment[s] of a deficiency arising out of an erroneous refund," Minn. Stat. § 289A.37, subd. 2, and assessments made after a "return is filed," Minn. Stat. § 289A.38, subd. 1. In harmonizing the two provisions, the Commissioner argues that the general-assessment provision provides 3-1/2 years within which she may assess a deficiency in a taxpayer's return, regardless of the reason for the assessment. The

13

Commissioner's interpretation finds support in the text of the general-assessment provision, which states that the only exceptions to the 3-1/2-year period are "provided in [section 289A.38]." Minn. Stat. § 289A.38, subd. 2. That section lists several situations in which other time limits apply, such as when a taxpayer files a false or fraudulent return, but assessing a taxpayer to recover an erroneous refund is not among them. *See id.*, subds. 4-16. Instead, the erroneous-refund provision is found in the immediately preceding section, Minn. Stat. § 289A.37, and therefore, at least according to the Commissioner, does not shorten her general authority to assess a deficiency in a taxpayer's return within 3-1/2 years. The Commissioner thus argues that the erroneous-refund provision applies only when an erroneous refund is unrelated to a dispute about the taxpayer's return. Such a situation could occur, for example, when she sends a refund check to the wrong taxpayer based on a computer-system error. In this case, however, the Commissioner claims that the cooperatives' tax returns led to the erroneous refunds, which implicates only her general-assessment authority.

A second interpretation, offered by the cooperatives, also harmonizes the two provisions. According to the cooperatives, the erroneous-refund provision applies whenever a taxpayer receives an erroneous refund, regardless of the reason. The cooperatives rely on the text of the erroneous-refund provision, which has no limit other than it applies to an "assessment of a deficiency arising out of an erroneous refund," the precise circumstance presented here. The cooperatives argue that the Commissioner's interpretation, which construes the erroneous-refund provision as applying only to refunds resulting from system errors, impermissibly adds language to an otherwise

14

unambiguous statute. The cooperatives further describe the general-assessment provision as a fallback statute that applies only when a more specific statute of limitations is unavailable.

In determining which statute of limitations to apply, we ordinarily look to the essence or gravamen of an action. *Weavewood*, 821 N.W.2d at 581. Factually, the Commissioner does not dispute that the "deficiency ar[ose] out of an erroneous refund." However, the mechanism used by the Commissioner to recover the tax deficiency also arose out of her assessment authority. Accordingly, when we examine the "essence" of the action in this case, there are two reasonable alternatives, either of which describes the gravamen of the action.

We therefore turn to the canons of construction to resolve the conflict. One such canon, applicable here, is that, when a conflict exists between two statutory provisions, the "[s]pecific provisions in a statute control general provisions." *Beck v. Groe*, 245 Minn. 28, 41, 70 N.W.2d 886, 895 (1955). As we have explained, "[t]he principle of construction that specific terms covering the given subject matter will prevail over general language of the same or another statute which might otherwise prove controlling is well settled." *Id.* The canon often applies in situations in which the general and the specific provisions "exist side by side," *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, ___ U.S ___, 132 S. Ct. 2065, 2071 (2012), and the "two are interrelated and closely positioned, both in fact being parts of [the same statutory scheme]," *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981) (per curiam). In fact, the canon has particular applicability when, as here, the Legislature "has enacted a comprehensive

scheme and has deliberately targeted specific problems with specific solutions." *See RadLAX*, ___ U.S. at ___, 132 S. Ct. at 2071 (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 519 (1996) (Thomas, J., dissenting).

Both statute-of-limitation provisions are part of a comprehensive scheme regulating the administration of, and compliance with, the Minnesota tax code. The specific problem targeted by Minn. Stat. § 289A.37, subd. 2, is the belated pursuit of erroneous refunds by the Commissioner when taxpayers have potentially relied on the refunds to their detriment. It also applies in a narrower set of circumstances than does the general-assessment provision: only to cases in which the Commissioner has erroneously refunded money to a taxpayer. In contrast, the general-assessment provision applies broadly to any assessments related to the filing of a tax return that arise out of the Commissioner's general-assessment authority. Because there is no persuasive reason in this case to depart from the application of the general/specific canon, the erroneous-refund provision controls over the general-assessment provision in cases in which the erroneous-refund provision applies. *RadLAX*, ___ U.S. ___, 132 S. Ct. at 2071; *Nathan v. St. Paul Mut. Ins. Co.*, 243 Minn. 430, 438-39, 68 N.W.2d 385, 391 (1955); *see also Nielsen v. 2003 Honda Accord*, 845 N.W.2d 754, 756 (Minn. 2013) (stating that the canon does not apply when it is contrary to the "manifest intent of the Legislature").

In sum, we hold that, in cases in which the Commissioner assesses a taxpayer based on a deficiency created by an erroneous refund, the 2-year statute of limitations in

Minn. Stat. § 289A.37, subd. 2, generally applies.[3] Accordingly, we remand to the tax court to apply the 2-year statute of limitations to the four cooperatives that requested partial summary judgment based on the alleged untimeliness of the Commissioner's assessments.[4]

## IV.

For the foregoing reasons, we affirm the tax court's decision in part, reverse in part, and remand to the tax court for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.


PAGE and LILLEHAUG, JJ., took no part in the consideration or decision of this case.

---

[3] Our conclusion has no bearing on the Commissioner's statutory authority to assess a taxpayer "at any time" if the taxpayer obtains a refund by fraud or misrepresentation of a material fact, *see* Minn. Stat. § 289A.37, subd. 2; nor does it alter the statute of limitations for civil or criminal actions against a taxpayer, *see id.* §§ 289A.60, 289A.63 (2014).

[4] Like the tax court, we express no opinion on the Commissioner's argument that the cooperatives failed to comply with the requirements of Minn. Stat. § 289A.50 (2014), which provides procedures for how a taxpayer credits or returns refunded sales taxes to its customers.